**EXHIBIT 3-B**

**(6)** the occurrence of any Transfer not permitted by the Loan Documents;

**(7)** the occurrence of a Bankruptcy Event;

**(8)** the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Loan Agreement or the Security Instrument or Lender's interest in the Mortgaged Property;

**(9)** if Borrower, Guarantor, or Key Principal is a trust, or if Control of Borrower, Guarantor, or Key Principal is Transferred or if a Restricted Ownership Interest in Borrower, Guarantor, or Key Principal would be Transferred due to the termination or revocation of a trust, the termination or revocation of such trust, except as set forth in Section 11.03(d);

**(10)** any failure by Borrower to complete any Repair related to fire, life, or safety issues in accordance with the terms of this Loan Agreement within the Completion Period (or such other date set forth on the Required Repair Schedule or otherwise required by Lender in writing for such Repair); or

**(11)** any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust, or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

**(b) Events of Default Subject to a Specified Cure Period.**

Any of the following shall constitute an Event of Default subject to the cure period set forth in the Loan Documents:

**(1)** if Key Principal or Guarantor is a natural person, the death of such individual, unless all requirements of Section 11.03(e) are met;

**(2)** the occurrence of a Guarantor Bankruptcy Event, unless requirements of Section 11.03(f) are met;

**(3)** any failure by Borrower, Key Principal, or Guarantor to comply with the provisions of Section 5.02(b) and Section 5.02(c); or

**(4)** any failure by Borrower to perform any obligation under this Loan Agreement or any Loan Document that is subject to a specified written notice and cure period, which failure continues beyond such specified written notice and cure period as set forth herein or in the applicable Loan Document.

**(c) Events of Default Subject to Extended Cure Period.**

The following shall constitute an Event of Default if the existence of such condition or event, or such failure to perform or default in performance continues for a period of thirty (30)


**© 2016 Fannie Mae**

days after written notice by Lender to Borrower of the existence of such condition or event, or of such failure to perform or default in performance, provided, however, such period may be extended for up to an additional thirty (30) days if Borrower, in the discretion of Lender, is diligently pursuing a cure of such; provided, further, however, no such written notice, grace period, or extension shall apply if, in Lender's discretion, immediate exercise by Lender of a right or remedy under this Loan Agreement or any Loan Document is required to avoid harm to Lender or impairment of the Mortgage Loan (including the Loan Documents), the Mortgaged Property or any other security given for the Mortgage Loan:

**(1)** any failure by Borrower to perform any of its obligations under this Loan Agreement or any Loan Document (other than those specified in Section 14.01(a) or Section 14.01(b) above) as and when required.

**Section 14.02. Remedies.**

**(a) Acceleration; Foreclosure.**

If an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any Accrued Interest, interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other Indebtedness, at the option of Lender, shall immediately become due and payable, without any prior written notice to Borrower, unless applicable law requires otherwise (and in such case, after any required written notice has been given). Lender may exercise this option to accelerate regardless of any prior forbearance. In addition, Lender shall have all rights and remedies afforded to Lender hereunder and under the other Loan Documents, including, foreclosure on and/or the power of sale of the Mortgaged Property, as provided in the Security Instrument, and any rights and remedies available to Lender at law or in equity (subject to Borrower's statutory rights of reinstatement, if any). Any proceeds of a Foreclosure Event may be held and applied by Lender as additional collateral for the Indebtedness pursuant to this Loan Agreement. Notwithstanding the foregoing, the occurrence of any Bankruptcy Event shall automatically accelerate the Mortgage Loan and all obligations and Indebtedness shall be immediately due and payable without written notice or further action by Lender.

**(b) Loss of Right to Disbursements from Collateral Accounts.**

If an Event of Default has occurred and is continuing, Borrower shall immediately lose all of its rights to receive disbursements from the Reserve/Escrow Accounts and any Collateral Accounts. During the continuance of any such Event of Default, Lender may use the Reserve/Escrow Account Funds and any Collateral Account Funds (or any portion thereof) for any purpose, including:

**(1)** repayment of the Indebtedness, including principal prepayments and the Prepayment Premium applicable to such full or partial prepayment, as applicable (however, such application of funds shall not cure or be deemed to cure any Event of Default);

**(2)** reimbursement of Lender for all losses and expenses (including reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default;


**© 2016 Fannie Mae**

(3) completion of the Replacement or Repair or for any other replacement or repair to the Mortgaged Property; and

(4) payment of any amount expended in exercising (and the exercise of) all rights and remedies available to Lender at law or in equity or under this Loan Agreement or under any of the other Loan Documents.

Nothing in this Loan Agreement shall obligate Lender to apply all or any portion of the Reserve/Escrow Account Funds or Collateral Account Funds on account of any Event of Default by Borrower or to repayment of the Indebtedness or in any specific order of priority.

**(c) Remedies Cumulative.**

Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of additional default by Borrower in order to exercise any of its remedies with respect to an Event of Default.

**Section 14.03. Additional Lender Rights; Forbearance.**

**(a) No Effect Upon Obligations.**

Lender may, but shall not be obligated to, agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, Guarantor, Key Principal, or other third party obligor, to take any of the following actions:

(1) the time for payment of the principal of or interest on the Indebtedness may be extended, or the Indebtedness may be renewed in whole or in part;

(2) the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

(3) the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

(4) any or all payments due under this Loan Agreement or any other Loan Document may be reduced;

(5) any Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount of the Mortgage Loan;

(6) any amounts under this Loan Agreement or any other Loan Document may be released;


**© 2016 Fannie Mae**

(7) any security for the Indebtedness may be modified, exchanged, released, surrendered, or otherwise dealt with, or additional security may be pledged or mortgaged for the Indebtedness;

(8) the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower; or

(9) any other terms of the Loan Documents may be modified.

**(b) No Waiver of Rights or Remedies.**

Any waiver of an Event of Default or forbearance by Lender in exercising any right or remedy under this Loan Agreement or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of any other Event of Default or preclude the exercise or failure to exercise of any other right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise or failure to exercise of any other right available to Lender. Lender's receipt of any insurance proceeds or amounts in connection with a Condemnation Action shall not operate to cure or waive any Event of Default.

**(c) Appointment of Lender as Attorney-In-Fact.**

Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any officer of Lender or any Person designated by Lender for that purpose) as Borrower's true and lawful proxy and attorney-in-fact (and agent-in-fact) in Borrower's name, place, and stead, with full power of substitution, to:

(1) use any of the funds in the Replacement Reserve Account or Repairs Escrow Account for the purpose of making or completing the Replacements or Repairs;

(2) make such additions, changes, and corrections to the Replacements or Repairs as shall be necessary or desirable to complete the Replacements or Repairs;

(3) employ such contractors, subcontractors, agents, architects, and inspectors as shall be required for such purposes;

(4) pay, settle, or compromise all bills and claims for materials and work performed in connection with the Replacements or Repairs, or as may be necessary or desirable for the completion of the Replacements or Repairs, or for clearance of title;

(5) adjust and compromise any claims under any and all policies of insurance required pursuant to this Loan Agreement and any other Loan Document, subject only to Borrower's rights under this Loan Agreement;


**© 2016 Fannie Mae**

**(6)** appear in and prosecute any action arising from any insurance policies;

**(7)** collect and receive the proceeds of insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds;

**(8)** commence, appear in, and prosecute, in Lender's or Borrower's name, any Condemnation Action;

**(9)** settle or compromise any claim in connection with any Condemnation Action;

**(10)** execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

**(11)** prosecute and defend all actions or proceedings in connection with the Mortgaged Property or the rehabilitation and repair of the Mortgaged Property;

**(12)** take such actions as are permitted in this Loan Agreement and any other Loan Documents;

**(13)** execute such financing statements and other documents and to do such other acts as Lender may require to perfect and preserve Lender's security interest in, and to enforce such interests in, the collateral; and

**(14)** carry out any remedy provided for in this Loan Agreement and any other Loan Documents, including endorsing Borrower's name to checks, drafts, instruments and other items of payment and proceeds of the collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of Borrower, changing the address of Borrower to that of Lender, opening all envelopes addressed to Borrower, and applying any payments contained therein to the Indebtedness.

Borrower hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable and shall not be affected by the disability or incompetence of Borrower. Borrower specifically acknowledges and agrees that this power of attorney granted to Lender may be assigned by Lender to Lender's successors or assigns as holder of the Note (and the other Loan Documents). The foregoing powers conferred on Lender under this Section 14.03(c) shall not impose any duty upon Lender to exercise any such powers and shall not require Lender to incur any expense or take any action. Borrower hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Loan Agreement and any other Loan Documents.

Notwithstanding the foregoing provisions, Lender shall not exercise its rights as set forth in this Section 14.03(c) unless: (A) an Event of Default has occurred and is continuing, or (B) Lender determines, in its discretion, that exigent circumstances exist or that such exercise is necessary or prudent in order to protect and preserve the Mortgaged Property, or Lender's lien priority and security interest in the Mortgaged Property.


**© 2016 Fannie Mae**

**(d) Borrower Waivers.**

If more than one Person signs this Loan Agreement as Borrower, each Borrower, with respect to any other Borrower, hereby agrees that Lender, in its discretion, may:

**(1)** bring suit against Borrower, or any one or more of Borrower, jointly and severally, or against any one or more of them;

**(2)** compromise or settle with any one or more of the persons constituting Borrower, for such consideration as Lender may deem proper;

**(3)** release one or more of the persons constituting Borrower, from liability; or

**(4)** otherwise deal with Borrower, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from any Borrower the full amount of the Indebtedness.

**Section 14.04. Waiver of Marshaling.**

Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Loan Agreement, any other Loan Document or applicable law. Lender shall have the right to determine the order in which all or any part of the Indebtedness is satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Loan Agreement waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Loan Agreement or any other Loan Documents.

Lender shall account for any moneys received by Lender in respect of any foreclosure on or disposition of collateral hereunder and under the other Loan Documents provided that Lender shall not have any duty as to any collateral, and Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers. NONE OF LENDER OR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR REPRESENTATIVES SHALL BE RESPONSIBLE TO BORROWER (a) FOR ANY ACT OR FAILURE TO ACT UNDER ANY POWER OF ATTORNEY OR OTHERWISE, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED PURSUANT TO A FINAL, NON-APPEALABLE COURT ORDER BY A COURT OF COMPETENT JURISDICTION, NOR (b) FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.


**© 2016 Fannie Mae**

# ARTICLE 15 - MISCELLANEOUS

**Section 15.01. Governing Law; Consent to Jurisdiction and Venue.**

**(a) Governing Law.**

This Loan Agreement and any other Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the Property Jurisdiction without regard to the application of choice of law principles.

**(b) Venue.**

Any controversy arising under or in relation to this Loan Agreement or any other Loan Document shall be litigated exclusively in the Property Jurisdiction without regard to conflicts of laws principles. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Loan Agreement or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence, or otherwise.

**Section 15.02. Notice.**

**(a) Process of Serving Notice.**

Except as otherwise set forth herein or in any other Loan Document, all notices under this Loan Agreement and any other Loan Document shall be:

**(1)** in writing and shall be:

**(A)** delivered, in person;

**(B)** mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

**(C)** sent by overnight courier; or

**(D)** sent by electronic mail with originals to follow by overnight courier;

**(2)** addressed to the intended recipient at Borrower's Notice Address and Lender's Notice Address, as applicable; and

**(3)** deemed given on the earlier to occur of:

**(A)** the date when the notice is received by the addressee; or

**(B)** if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.


**© 2016 Fannie Mae**

**(b) Change of Address.**

Any party to this Loan Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other parties identified on the Summary of Loan Terms in accordance with this Section 15.02.

**(c) Default Method of Notice.**

Any required notice under this Loan Agreement or any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 15.02.

**(d) Receipt of Notices.**

Neither Borrower nor Lender shall refuse or reject delivery of any notice given in accordance with this Loan Agreement. Each party is required to acknowledge, in writing, the receipt of any notice upon request by the other party.

**Section 15.03. Successors and Assigns Bound; Sale of Mortgage Loan.**

**(a) Binding Agreement.**

This Loan Agreement shall bind, and the rights granted by this Loan Agreement shall inure to, the successors and assigns of Lender and the permitted successors and assigns of Borrower. However, a Transfer not permitted by this Loan Agreement shall be an Event of Default and shall be void ab initio.

**(b) Sale of Mortgage Loan; Change of Servicer.**

Nothing in this Loan Agreement shall limit Lender's (including its successors and assigns) right to sell or transfer the Mortgage Loan or any interest in the Mortgage Loan. The Mortgage Loan or a partial interest in the Mortgage Loan (together with this Loan Agreement and the other Loan Documents) may be sold one or more times without prior written notice to Borrower. A sale may result in a change of the Loan Servicer.

**Section 15.04. Counterparts.**

This Loan Agreement may be executed in any number of counterparts with the same effect as if the parties hereto had signed the same document and all such counterparts shall be construed together and shall constitute one instrument.

**Section 15.05. Joint and Several (or Solidary) Liability.**

If more than one Person signs this Loan Agreement as Borrower, the obligations of such Persons shall be joint and several (solidary instead for purposes of Louisiana law).


**© 2016 Fannie Mae**

**Section 15.06. Relationship of Parties; No Third Party Beneficiary.**

**(a) Solely Creditor and Debtor.**

The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Loan Agreement shall create any other relationship between Lender and Borrower. Nothing contained in this Loan Agreement shall constitute Lender as a joint venturer, partner, or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations, or contracts of Borrower.

**(b) No Third Party Beneficiaries.**

No creditor of any party to this Loan Agreement and no other Person shall be a third party beneficiary of this Loan Agreement or any other Loan Document or any account created or contemplated under this Loan Agreement or any other Loan Document. Nothing contained in this Loan Agreement shall be deemed or construed to create an obligation on the part of Lender to any third party nor shall any third party have a right to enforce against Lender any right that Borrower may have under this Loan Agreement. Without limiting the foregoing:

**(1)** any Servicing Arrangement between Lender and any Loan Servicer shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness;

**(2)** Borrower shall not be a third party beneficiary of any Servicing Arrangement; and

**(3)** no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**Section 15.07. Severability; Entire Agreement; Amendments.**

The invalidity or unenforceability of any provision of this Loan Agreement or any other Loan Document shall not affect the validity or enforceability of any other provision of this Loan Agreement or of any other Loan Document, all of which shall remain in full force and effect, including the Guaranty. This Loan Agreement contains the complete and entire agreement among the parties as to the matters covered, rights granted, and the obligations assumed in this Loan Agreement. This Loan Agreement may not be amended or modified except by written agreement signed by the parties hereto.

**Section 15.08. Construction.**

**(a)** The captions and headings of the sections of this Loan Agreement and the Loan Documents are for convenience only and shall be disregarded in construing this Loan Agreement and the Loan Documents.

**(b)** Any reference in this Loan Agreement to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively,


**© 2016 Fannie Mae**

to an Exhibit or Schedule attached to this Loan Agreement or to a Section or Article of this Loan Agreement.

**(c)** Any reference in this Loan Agreement to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

**(d)** Use of the singular in this Loan Agreement includes the plural and use of the plural includes the singular.

**(e)** As used in this Loan Agreement, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only and not a limitation.

**(f)** Whenever Borrower's knowledge is implicated in this Loan Agreement or the phrase "to Borrower's knowledge" or a similar phrase is used in this Loan Agreement, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

**(g)** Unless otherwise provided in this Loan Agreement, if Lender's approval, designation, determination, selection, estimate, action, or decision is required, permitted, or contemplated hereunder, such approval, designation, determination, selection, estimate, action, or decision shall be made in Lender's sole and absolute discretion.

**(h)** All references in this Loan Agreement to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

**(i)** "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

**(j)** If the Mortgage Loan proceeds are disbursed on a date that is later than the Effective Date, as described in Section 2.02(a)(1), the representations and warranties in the Loan Documents with respect to the ownership and operation of the Mortgaged Property shall be deemed to be made as of the disbursement date.

**Section 15.09. Mortgage Loan Servicing.**

All actions regarding the servicing of the Mortgage Loan, including the collection of payments, the giving and receipt of notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such written notice from Lender shall govern. The Loan Servicer may change from time to time (whether related or unrelated to a sale of the Mortgage Loan). If there is a change of the Loan Servicer, Borrower will be given written notice of the change.


**© 2016 Fannie Mae**

**Section 15.10. Disclosure of Information.**

Lender may furnish information regarding Borrower, Key Principal, or Guarantor, or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase, or securitization of the Mortgage Loan, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

**Section 15.11. Waiver; Conflict.**

No specific waiver of any of the terms of this Loan Agreement shall be considered as a general waiver. If any provision of this Loan Agreement is in conflict with any provision of any other Loan Document, the provision contained in this Loan Agreement shall control.

**Section 15.12. No Reliance.**

Borrower acknowledges, represents, and warrants that:

**(a)** it understands the nature and structure of the transactions contemplated by this Loan Agreement and the other Loan Documents;

**(b)** it is familiar with the provisions of all of the documents and instruments relating to such transactions;

**(c)** it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property;

**(d)** it has had the opportunity to consult counsel; and

**(e)** it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Loan Agreement or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with this Loan Agreement, any other Loan Document, or any of the matters contemplated hereby or thereby.

**Section 15.13. Subrogation.**

If, and to the extent that, the proceeds of the Mortgage Loan are used to pay, satisfy, or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust, or other lien encumbering the Mortgaged Property, such Mortgage Loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by such prior lien, whether or not such prior lien is released.


**© 2016 Fannie Mae**

**Section 15.14. Counting of Days.**

Except where otherwise specifically provided, any reference in this Loan Agreement to a period of "days" means calendar days, not Business Days. If the date on which Borrower is required to perform an obligation under this Loan Agreement is not a Business Day, Borrower shall be required to perform such obligation by the Business Day immediately preceding such date; provided, however, in respect of any Payment Date, or if the Maturity Date is other than a Business Day, Borrower shall be obligated to make such payment by the Business Day immediately following such date.

**Section 15.15. Revival and Reinstatement of Indebtedness.**

If the payment of all or any part of the Indebtedness by Borrower, Guarantor, or any other Person, or the transfer to Lender of any collateral or other property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection therewith, and the Indebtedness shall be automatically revived, reinstated, and restored by such amount and shall exist as though such Voidable Transfer had never been made.

**Section 15.16. Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Loan Agreement and the other Loan Documents, time is of the essence.

**Section 15.17. Final Agreement.**

THIS LOAN AGREEMENT ALONG WITH ALL OF THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Loan Agreement and the other Loan Documents. This Loan Agreement, the other Loan Documents, and any of their provisions may not be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement.

**Section 15.18. WAIVER OF TRIAL BY JURY.**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (a) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS LOAN AGREEMENT OR


**© 2016 Fannie Mae**

ANY OTHER LOAN DOCUMENT, OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER, THAT IS TRIABLE OF RIGHT BY A JURY, AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

**[Remainder of Page Intentionally Blank]**


**© 2016 Fannie Mae**

**IN WITNESS WHEREOF**, Borrower and Lender have signed and delivered this Loan Agreement under seal (where applicable) or have caused this Loan Agreement to be signed and delivered under seal (where applicable) by their duly authorized representatives. Where applicable law so provides, Borrower and Lender intend that this Loan Agreement shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

**KRCM ASTORIA PORTFOLIO CORP.**, a New York corporation

By: *[signature]* (SEAL)
Name: Rajmattie Persaud
Title: President

**[SIGNATURES CONTINUE ON NEXT PAGE]**


**© 2016 Fannie Mae**

**LENDER:**

**GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation

By:____________________________(SEAL)
Name: Ann Sutton
Title: Senior Closing Coordinator


**© 2016 Fannie Mae**

# SCHEDULE 1
# TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

## Definitions Schedule
## (Interest Rate Type – Fixed Rate)

Capitalized terms used in the Loan Agreement have the meanings given to such terms in this Definitions Schedule.

"**Accrued Interest**" means unpaid interest, if any, on the Mortgage Loan that has not been added to the unpaid principal balance of the Mortgage Loan pursuant to Section 2.02(b) (Capitalization of Accrued But Unpaid Interest) of the Loan Agreement.

"**Additional Lender Repairs**" means repairs of the type listed on the Required Repair Schedule but not otherwise identified thereon that are determined advisable by Lender to keep the Mortgaged Property in good order and repair (ordinary wear and tear excepted) and in good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Additional Lender Replacements**" means replacements of the type listed on the Required Replacement Schedule but not otherwise identified thereon that are determined advisable by Lender to keep the Mortgaged Property in good order and repair (ordinary wear and tear excepted) and in good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Amortization Period**" has the meaning set forth in the Summary of Loan Terms.

"**Amortization Type**" has the meaning set forth in the Summary of Loan Terms.

"**Bank Secrecy Act**" means the Bank Secrecy Act of 1970, as amended (e.g., 31 U.S.C. Sections 5311-5330).

"**Bankruptcy Event**" means any one or more of the following:

(a) the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Borrower;

(b) the acknowledgment in writing by Borrower (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

(c) the making of a general assignment for the benefit of creditors by Borrower;

(d) the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Borrower; or

(e) the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator,


**© 2016 Fannie Mae**

trustee or other similar officer who exercises control over Borrower or any substantial part of the assets of Borrower;

provided, however, that any proceeding or case under (d) or (e) above shall not be a Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, Guarantor, or Key Principal, (2) any Person Controlling Borrower, Guarantor, or Key Principal, or (3) any Person Controlled by or under common Control with Borrower, Guarantor, or Key Principal (in which event such case or proceeding shall be a Bankruptcy Event immediately).

"**Borrower**" means, individually (and jointly and severally (solidarily instead for purposes of Louisiana law) if more than one), the entity (or entities) identified as "Borrower" in the first paragraph of the Loan Agreement.

"**Borrower Affiliate**" means, as to Borrower, Guarantor or Key Principal:

(a) any Person that owns any direct ownership interest in Borrower, Guarantor or Key Principal;

(b) any Person that indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in Borrower, Guarantor or Key Principal;

(c) any Person Controlled by, under common Control with, or which Controls, Borrower, Guarantor or Key Principal;

(d) any entity in which Borrower, Guarantor or Key Principal directly or indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in such entity; or

(e) any other individual that is related (to the third degree of consanguinity) by blood or marriage to Borrower, Guarantor or Key Principal.

"**Borrower Requested Repairs**" means repairs not listed on the Required Repair Schedule requested by Borrower to be reimbursed from the Repairs Escrow Account and determined advisable by Lender to keep the Mortgaged Property in good order and repair and in a good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Borrower Requested Replacements**" means replacements not listed on the Required Replacement Schedule requested by Borrower to be reimbursed from the Replacement Reserve Account and determined advisable by Lender to keep the Mortgaged Property in good order and repair and in a good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Borrower's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Borrower's Notice Address**" has the meaning set forth in the Summary of Loan Terms.


**© 2016 Fannie Mae**

"**Business Day**" means any day other than (a) a Saturday, (b) a Sunday, (c) a day on which Lender is not open for business, or (d) a day on which the Federal Reserve Bank of New York is not open for business.

"**Collateral Account Funds**" means, collectively, the funds on deposit in any or all of the Collateral Accounts, including the Reserve/Escrow Account Funds.

"**Collateral Accounts**" means any account designated as such by Lender pursuant to a Collateral Agreement or as established pursuant to this Loan Agreement, including the Reserve/Escrow Account.

"**Collateral Agreement**" means any separate agreement between Borrower and Lender for the establishment of any other fund, reserve or account.

"**Completion Period**" has the meaning set forth in the Summary of Loan Terms.

"**Condemnation Action**" has the meaning set forth in the Security Instrument.

"**Control**" (including with correlative meanings, such as "Controlling," "Controlled by" and "under common Control with") means, as applied to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and operations of such entity, whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"**Credit Score**" means a numerical value or a categorization derived from a statistical tool or modeling system used to measure credit risk and predict the likelihood of certain credit behaviors, including default.

"**Debt Service Amounts**" means the Monthly Debt Service Payments and all other amounts payable under the Loan Agreement, the Note, the Security Instrument or any other Loan Document.

"**Default Rate**" means an interest rate equal to the lesser of:

(a) the sum of the Interest Rate plus four (4) percentage points; or

(b) the maximum interest rate which may be collected from Borrower under applicable law.

"**Definitions Schedule**" means this Schedule 1 (Definitions Schedule) to the Loan Agreement.

"**Economic Sanctions**" means any economic or financial sanction administered or enforced by the United States Government (including, without limitation, those administered by OFAC at http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx), the U.S. Department of Commerce, or the U.S. Department of State.


**© 2016 Fannie Mae**

"**Effective Date**" has the meaning set forth in the Summary of Loan Terms.

"**Employee Benefit Plan**" means a plan described in Section 3(3) of ERISA, regardless of whether the plan is subject to ERISA.

"**Enforcement Costs**" has the meaning set forth in the Security Instrument.

"**Environmental Indemnity Agreement**" means that certain Environmental Indemnity Agreement dated as of the Effective Date made by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"**Environmental Inspections**" has the meaning set forth in the Environmental Indemnity Agreement.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnity Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, with respect to Borrower, any entity that, together with Borrower, would be treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code, or Section 4001(a)(14) of ERISA, or the regulations thereunder.

"**ERISA Plan**" means any employee pension benefit plan within the meaning of Section 3(2) of ERISA (or related trust) that is subject to the requirements of Title IV of ERISA, Sections 430 or 431 of the Internal Revenue Code, or Sections 302, 303, or 304 of ERISA, which is maintained or contributed to by Borrower or its ERISA Affiliates.

"**Event of Default**" means the occurrence of any event listed in Section 14.01 (Events of Default) of the Loan Agreement.

"**Exceptions to Representations and Warranties Schedule**" means that certain Schedule 7 (Exceptions to Representations and Warranties Schedule) to the Loan Agreement.

"**First Payment Date**" has the meaning set forth in the Summary of Loan Terms.

"**First Principal and Interest Payment Date**" has the meaning set forth in the Summary of Loan Terms, if applicable.

"**Fixed Rate**" has the meaning set forth in the Summary of Loan Terms.

"**Fixtures**" has the meaning set forth in the Security Instrument.

"**Force Majeure**" shall mean acts of God, acts of war, civil disturbance, governmental action (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of Borrower), strikes, lockouts, fire, unavoidable casualties or any other


**© 2016 Fannie Mae**

causes beyond the reasonable control of Borrower (other than lack of financing), and of which Borrower shall have notified Lender in writing within ten (10) days after its occurrence.

"**Foreclosure Event**" means:

(a) foreclosure under the Security Instrument;

(b) any other exercise by Lender of rights and remedies (whether under the Security Instrument or under applicable law, including Insolvency Laws) as holder of the Mortgage Loan and/or the Security Instrument, as a result of which Lender (or its designee or nominee) or a third party purchaser becomes owner of the Mortgaged Property;

(c) delivery by Borrower to Lender (or its designee or nominee) of a deed or other conveyance of Borrower's interest in the Mortgaged Property in lieu of any of the foregoing; or

(d) in Louisiana, any dation en paiement.

"**Goods**" has the meaning set forth in the Security Instrument.

"**Governmental Authority**" means any court, board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over Borrower or the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

"**Guarantor**" means, individually and collectively, any guarantor of the Indebtedness or any other obligation of Borrower under any Loan Document.

"**Guarantor Bankruptcy Event**" means any one or more of the following:

(a) the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Guarantor;

(b) the acknowledgment in writing by Guarantor (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

(c) the making of a general assignment for the benefit of creditors by Guarantor;

(d) the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Guarantor; or

(e) the appointment of a receiver, liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Guarantor or any substantial part of the assets of Guarantor, as applicable;

provided, however, that any proceeding or case under (d) or (e) above shall not be a Guarantor Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as


**© 2016 Fannie Mae**

such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, Guarantor or Key Principal, (2) any Person Controlling Borrower, Guarantor or Key Principal, or (3) any Person Controlled by or under common Control with Borrower, Guarantor or Key Principal (in which event such case or proceeding shall be a Guarantor Bankruptcy Event immediately).

"**Guarantor's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Guarantor's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Guaranty**" means, individually and collectively, any Payment Guaranty, Non-Recourse Guaranty or other guaranty executed by Guarantor in connection with the Mortgage Loan.

"**Immediate Family Members**" means a child, stepchild, grandchild, spouse, sibling, or parent, each of whom is not a Prohibited Person.

"**Imposition Deposits**" has the meaning set forth in the Security Instrument.

"**Impositions**" has the meaning set forth in the Security Instrument.

"**Improvements**" has the meaning set forth in the Security Instrument.

"**Indebtedness**" has the meaning set forth in the Security Instrument.

"**Initial Replacement Reserve Deposit**" has the meaning set forth in the Summary of Loan Terms.

"**Insolvency Laws**" means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar laws, proceedings, or equitable principles affecting the enforcement of creditors' rights, as amended from time to time.

"**Insolvent**" means:

(a) that the sum total of all of a specified Person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of such Person's non-exempt assets, i.e., all of the assets of such Person that are available to satisfy claims of creditors; or

(b) such Person's inability to pay its debts as they become due.

"**Intended Prepayment Date**" means the date upon which Borrower intends to make a prepayment on the Mortgage Loan, as set forth in the Prepayment Notice.

"**Interest Accrual Method**" has the meaning set forth in the Summary of Loan Terms.


**© 2016 Fannie Mae**

"**Interest Only Term**" has the meaning set forth in the Summary of Loan Terms.

"**Interest Rate**" means the Fixed Rate.

"**Interest Rate Type**" has the meaning set forth in the Summary of Loan Terms.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Investor**" means any Person to whom Lender intends to (a) sell, transfer, deliver or assign the Mortgage Loan in the secondary mortgage market, or (b) sell an MBS backed by the Mortgage Loan.

"**Key Principal**" means, collectively:

(a) the natural person(s) or entity that Controls Borrower that Lender determines is critical to the successful operation and management of Borrower and the Mortgaged Property, as identified as such in the Summary of Loan Terms; or

(b) any natural person or entity who becomes a Key Principal after the date of the Loan Agreement and is identified as such in an assumption agreement, or another amendment or supplement to the Loan Agreement.

"**Key Principal's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Key Principal's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Land**" means the land described in Exhibit A to the Security Instrument.

"**Last Interest Only Payment Date**" has the meaning set forth in the Summary of Loan Terms, if applicable.

"**Late Charge**" means an amount equal to the delinquent amount then due under the Loan Documents multiplied by five percent (5%).

"**Leases**" has the meaning set forth in the Security Instrument.

"**Lender**" means the entity identified as "Lender" in the first paragraph of the Loan Agreement and its transferees, successors and assigns, or any subsequent holder of the Note.

"**Lender's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lender's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lender's Payment Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lien**" has the meaning set forth in the Security Instrument.


**© 2016 Fannie Mae**

"**Loan Agreement**" means the Multifamily Loan and Security Agreement dated as of the Effective Date executed by and between Borrower and Lender to which this Definitions Schedule is attached, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Loan Application**" means the application for the Mortgage Loan submitted by Borrower to Lender.

"**Loan Documents**" means the Note, the Loan Agreement, the Security Instrument, the Environmental Indemnity Agreement, the Guaranty, all guaranties, all indemnity agreements, all Collateral Agreements, all O&M Plans, and any other documents now or in the future executed by Borrower, Guarantor, Key Principal, any other guarantor or any other Person in connection with the Mortgage Loan, as such documents may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan Servicer**" means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, the Loan Agreement, the Security Instrument and any other Loan Document, and otherwise to service the Mortgage Loan for the benefit of Lender. Unless Borrower receives notice to the contrary, the Loan Servicer shall be the Lender originally named on the Summary of Loan Terms.

"**Loan Term**" has the meaning set forth in the Summary of Loan Terms.

"**Loan Year**" has the meaning set forth in the Summary of Loan Terms.

"**Material Commercial Lease**" means any Lease that is not a Residential Lease, and which is:

(a) a Lease comprising five percent (5%) or more of total gross income of the Mortgaged Property on an annualized basis;

(b) a master Lease (which term "master Lease" shall include any master Lease to a single corporate tenant);

(c) a cell tower Lease;

(d) a solar (power) Lease;

(e) a solar power purchase agreement; or

(f) a Lease of oil, gas, or mineral rights.

"**Maturity Date**" has the meaning set forth in the Summary of Loan Terms.

"**Maximum Inspection Fee**" has the meaning set forth in the Summary of Loan Terms.


**© 2016 Fannie Mae**

"**Maximum Repair Cost**" shall be the amount(s) set forth in the Required Repair Schedule, if any.

"**Maximum Repair Disbursement Interval**" has the meaning set forth in the Summary of Loan Terms.

"**Maximum Replacement Reserve Disbursement Interval**" has the meaning set forth in the Summary of Loan Terms.

"**MBS**" means an investment security that represents an undivided beneficial interest in a pool of mortgage loans or participation interests in mortgage loans held in trust pursuant to the terms of a governing trust document.

"**Mezzanine Debt**" means a loan to a direct or indirect owner of Borrower secured by a pledge of such owner's interest in an entity owning a direct or indirect interest in Borrower.

"**Minimum Repairs Disbursement Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Minimum Replacement Reserve Disbursement Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Monthly Debt Service Payment**" has the meaning set forth in the Summary of Loan Terms.

"**Monthly Replacement Reserve Deposit**" has the meaning set forth in the Summary of Loan Terms.

"**Mortgage Loan**" means the mortgage loan made by Lender to Borrower in the principal amount of the Note made pursuant to the Loan Agreement, evidenced by the Note and secured by the Loan Documents that are expressly stated to be security for the Mortgage Loan.

"**Mortgaged Property**" has the meaning set forth in the Security Instrument.

"**Multifamily Project**" has the meaning set forth in the Summary of Loan Terms.

"**Multifamily Project Address**" has the meaning set forth in the Summary of Loan Terms.

"**Non-Recourse Guaranty**" means, if applicable, that certain Guaranty of Non-Recourse Obligations of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Note**" means that certain Multifamily Note of even date herewith in the original principal amount of the stated Loan Amount made by Borrower in favor of Lender, and all schedules, riders, allonges and addenda attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.


**© 2016 Fannie Mae**

"**O&M Plan**" has the meaning set forth in the Environmental Indemnity Agreement.

"**OFAC**" means the United States Treasury Department, Office of Foreign Assets Control, and any successor thereto.

"**Payment Date**" means the First Payment Date and the first day of each month thereafter until the Mortgage Loan is fully paid.

"**Payment Guaranty**" means, if applicable, that certain Guaranty (Payment) of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Permitted Encumbrance**" has the meaning set forth in the Security Instrument.

"**Permitted Mezzanine Debt**" means Mezzanine Debt incurred by a direct or indirect owner or owners of Borrower where the exercise of any of the rights and remedies by the holder or holders of the Mezzanine Debt would not in any circumstance cause (a) a change in Control in Borrower, Key Principal, or Guarantor, or (b) a Transfer of a direct or indirect Restricted Ownership Interest in Borrower, Key Principal, or Guarantor.

"**Permitted Preferred Equity**" means Preferred Equity that does not (a) require mandatory dividends, distributions, payments or returns (including at maturity or in connection with a redemption), or (b) provide the Preferred Equity owner with rights or remedies on account of a failure to receive any preferred dividends, distributions, payments or returns (or, if such rights are provided, the exercise of such rights do not violate the Loan Documents or are otherwise exercised with the prior written consent of Lender in accordance with Article 11 (Liens, Transfers and Assumptions) of the Loan Agreement and the payment of all applicable fees and expenses as set forth in Section 11.03(g) (Further Conditions to Transfers and Assumption)).

"**Permitted Prepayment Date**" means the last Business Day of a calendar month.

"**Person**" means an individual, an estate, a trust, a corporation, a partnership, a limited liability company or any other organization or entity (whether governmental or private).

"**Personal Property**" means the Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"**Personalty**" has the meaning set forth in the Security Instrument.


**© 2016 Fannie Mae**

"**Preferred Equity**" means a direct or indirect equity ownership interest in, economic interests in, or rights with respect to, Borrower that provide an equity owner preferred dividend, distribution, payment, or return treatment relative to other equity owners.

"**Prepayment Lockout Period**" has the meaning set forth in the Summary of Loan Terms.

"**Prepayment Notice**" means the written notice that Borrower is required to provide to Lender in accordance with Section 2.03 (Lockout/Prepayment) of the Loan Agreement in order to make a prepayment on the Mortgage Loan, which shall include, at a minimum, the Intended Prepayment Date.

"**Prepayment Premium**" means the amount payable by Borrower in connection with a prepayment of the Mortgage Loan, as provided in Section 2.03 (Lockout/Prepayment) of the Loan Agreement and calculated in accordance with the Prepayment Premium Schedule.

"**Prepayment Premium Period End Date**" or "**Yield Maintenance Period End Date**" has the meaning set forth in the Summary of Loan Terms.

"**Prepayment Premium Period Term**" or "**Yield Maintenance Period Term**" has the meaning set forth in the Summary of Loan Terms.

"**Prepayment Premium Schedule**" means that certain Schedule 4 (Prepayment Premium Schedule) to the Loan Agreement.

"**Prohibited Person**" means:

(a) any Person with whom Lender or Fannie Mae is prohibited from doing business pursuant to any law, rule, regulation, judicial proceeding or administrative directive; or

(b) any Person identified on the United States Department of Housing and Urban Development's "Limited Denial of Participation, HUD Funding Disqualifications and Voluntary Abstentions List," or on the General Services Administration's "System for Award Management (SAM)" exclusion list, each of which may be amended from time to time, and any successor or replacement thereof; or

(c) any Person that is determined by Fannie Mae to pose an unacceptable credit risk due to the aggregate amount of debt of such Person owned or held by Fannie Mae; or

(d) any Person that has caused any unsatisfactory experience of a material nature with Fannie Mae or Lender, such as a default, fraud, intentional misrepresentation, litigation, arbitration or other similar act.

"**Property Jurisdiction**" has the meaning set forth in the Security Instrument.

"**Property Square Footage**" has the meaning set forth in the Summary of Loan Terms.


**© 2016 Fannie Mae**

"**Publicly-Held Corporation**" means a corporation, the outstanding voting stock of which is registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

"**Publicly-Held Trust**" means a real estate investment trust, the outstanding voting shares or beneficial interests of which are registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

"**Rents**" has the meaning set forth in the Security Instrument.

"**Repair Threshold**" has the meaning set forth in the Summary of Loan Terms.

"**Repairs**" means, individually and collectively, the Required Repairs, Borrower Requested Repairs, and Additional Lender Repairs.

"**Repairs Escrow Account**" means the account established by Lender into which the Repairs Escrow Deposit is deposited to fund the Repairs.

"**Repairs Escrow Account Administrative Fee**" has the meaning set forth in the Summary of Loan Terms.

"**Repairs Escrow Deposit**" has the meaning set forth in the Summary of Loan Terms.

"**Replacement Reserve Account**" means the account established by Lender into which the Replacement Reserve Deposits are deposited to fund the Replacements.

"**Replacement Reserve Account Administration Fee**" has the meaning set forth in the Summary of Loan Terms.

"**Replacement Reserve Account Interest Disbursement Frequency**" has the meaning set forth in the Summary of Loan Terms.

"**Replacement Reserve Deposits**" means the Initial Replacement Reserve Deposit, Monthly Replacement Reserve Deposits and any other deposits to the Replacement Reserve Account required by the Loan Agreement.

"**Replacement Threshold**" has the meaning set forth in the Summary of Loan Terms.

"**Replacements**" means, individually and collectively, the Required Replacements, Borrower Requested Replacements and Additional Lender Replacements.

"**Required Repair Schedule**" means that certain Schedule 6 (Required Repair Schedule) to the Loan Agreement.

"**Required Repairs**" means those items listed on the Required Repair Schedule.


**© 2016 Fannie Mae**

"**Required Replacement Schedule**" means that certain Schedule 5 (Required Replacement Schedule) to the Loan Agreement.

"**Required Replacements**" means those items listed on the Required Replacement Schedule.

"**Reserve/Escrow Account Funds**" means, collectively, the funds on deposit in the Reserve/Escrow Accounts.

"**Reserve/Escrow Accounts**" means, together, the Replacement Reserve Account and the Repairs Escrow Account.

"**Residential Lease**" means a Lease of an individual dwelling unit and shall not include any master Lease (which term "master Lease" includes any master Lease to a single corporate tenant).

"**Restoration**" means restoring and repairing the Mortgaged Property to the equivalent of its physical condition immediately prior to the casualty or to a condition approved by Lender following a casualty.

"**Restricted Ownership Interest**" means, with respect to any entity, the following:

(a) if such entity is a general partnership or a joint venture, fifty percent (50%) or more of all general partnership or joint venture interests in such entity;

(b) if such entity is a limited partnership:

(1) the interest of any general partner; or

(2) fifty percent (50%) or more of all limited partnership interests in such entity;

(c) if such entity is a limited liability company or a limited liability partnership:

(1) the interest of any managing member or the contractual rights of any non-member manager; or

(2) fifty percent (50%) or more of all membership or other ownership interests in such entity;

(d) if such entity is a corporation (other than a Publicly-Held Corporation) with only one class of voting stock, fifty percent (50%) or more of voting stock in such corporation;

(e) if such entity is a corporation (other than a Publicly-Held Corporation) with more than one class of voting stock, the amount of shares of voting stock sufficient to have the power to elect the majority of directors of such corporation; or


**© 2016 Fannie Mae**

(f) if such entity is a trust (other than a land trust or a Publicly-Held Trust), the power to Control such trust vested in the trustee of such trust or the ability to remove, appoint or substitute the trustee of such trust (unless the trustee of such trust after such removal, appointment or substitution is a trustee identified in the trust agreement approved by Lender).

"**Review Fee**" means the non-refundable fee of Three Thousand Dollars ($3,000) payable to Lender.

"**Sanctioned Country**" means a country subject to a comprehensive country-wide sanctions program administered and enforced by OFAC, which list is updated from time to time.

"**Sanctioned Person**" means (a) a Person named on the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC, available at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time; (b) (1) an agency of the government of a Sanctioned Country, (2) an organization controlled by a Sanctioned Country, or (3) a Person resident in a Sanctioned Country, to the extent any Person described in clauses (1), (2) or (3) is the subject of a sanctions program administered by OFAC; and, (c) a Person whose property and interests in property are blocked pursuant to an Executive Order or regulations administered by OFAC consistent with the guidance issued by OFAC.

"**Schedule of Interest Rate Type Provisions**" means that certain Schedule 3 (Schedule of Interest Rate Type Provisions) to the Loan Agreement.

"**Security Instrument**" means that certain multifamily mortgage, deed to secure debt or deed of trust executed and delivered by Borrower as security for the Mortgage Loan and encumbering the Mortgaged Property, including all riders or schedules attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicing Arrangement**" means any arrangement between Lender and the Loan Servicer for loss sharing or interim advancement of funds.

"**Summary of Loan Terms**" means that certain Schedule 2 (Summary of Loan Terms) to the Loan Agreement.

"**Taxes**" has the meaning set forth in the Security Instrument.

"**Title Policy**" means the mortgagee's loan policy of title insurance issued in connection with the Mortgage Loan and insuring the lien of the Security Instrument as set forth therein, as approved by Lender.

"**Total Parking Spaces**" has the meaning set forth in the Summary of Loan Terms.

"**Total Residential Units**" has the meaning set forth in the Summary of Loan Terms.


**© 2016 Fannie Mae**

"**Transfer**" means:

(a) a sale, assignment, transfer or other disposition (whether voluntary, involuntary, or by operation of law), other than Residential Leases, Material Commercial Leases or non-Material Commercial Leases permitted by this Loan Agreement;

(b) a granting, pledging, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary, or by operation of law);

(c) an issuance or other creation of a direct or indirect ownership interest;

(d) a withdrawal, retirement, removal or involuntary resignation of any owner or manager of a legal entity; or

(e) a merger, consolidation, dissolution or liquidation of a legal entity.

"**Transfer Fee**" means a fee equal to one percent (1%) of the unpaid principal balance of the Mortgage Loan payable to Lender.

"**UCC**" has the meaning set forth in the Security Instrument.

"**UCC Collateral**" has the meaning set forth in the Security Instrument.

"**Voidable Transfer**" means any fraudulent conveyance, preference or other voidable or recoverable payment of money or transfer of property.

"**Yield Maintenance Period End Date**" or "**Prepayment Premium Period End Date**" has the meaning set forth in the Summary of Loan Terms.

"**Yield Maintenance Period Term**" or "**Prepayment Premium Period Term**" has the meaning set forth in the Summary of Loan Terms.

**[INITIALS FOLLOW ON NEXT PAGE]**


**© 2016 Fannie Mae**

BORROWER'S INITIALS: _________


© 2016 Fannie Mae

**SCHEDULE 2**
**TO MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Summary of Loan Terms**
**(Interest Rate Type - Fixed Rate)**

| **I. GENERAL PARTY AND MULTIFAMILY PROJECT INFORMATION** | |
|---|---|
| **Borrower** | **KRCM ASTORIA PORTFOLIO CORP.**, a New York corporation |
| **Lender** | **GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation |
| **Key Principal** | **RAJMATTIE PERSAUD** |
| **Guarantor** | **RAJMATTIE PERSAUD** |
| **Multifamily Project** | Astoria Portfolio |
| **ADDRESSES** | |
| **Borrower's General Business Address** | 45 Jackson Street<br>Hempstead, New York 11550 |
| **Borrower's Notice Address** | 45 Jackson Street<br>Hempstead, New York 11550<br>E-mail: krcmreal@gmail.com |
| **Multifamily Project Address** | 23-05 30th Avenue<br>Astoria, New York 11102<br><br>23-15 30th Avenue<br>Astoria, New York 11102<br><br>21-80 38th Street<br>Astoria, New York 11105 |
| **Multifamily Project County** | Queens |
| **Key Principal's General Business Address** | 45 Jackson Street<br>Hempstead, New York 11550 |


**© 2013 Fannie Mae**

| | |
|---|---|
| **Key Principal's Notice Address** | 45 Jackson Street<br>Hempstead, New York 11550<br>E-mail: krcmreal@gmail.com |
| **Guarantor's General Business Address** | 45 Jackson Street<br>Hempstead, New York 11550 |
| **Guarantor's Notice Address** | 45 Jackson Street<br>Hempstead, New York 11550<br>E-mail: krcmreal@gmail.com |
| **Lender's General Business Address** | 419 Belle Air Lane<br>Warrenton, Virginia 20186 |
| **Lender's Notice Address** | 419 Belle Air Lane<br>Warrenton, Virginia 20186<br>Email: customercare@greyco.com |
| **Lender's Payment Address** | Greystone Servicing Corporation, Inc.<br>P. O. Box 281163<br>Atlanta, Georgia 30384-1163 |

| **II. MULTIFAMILY PROJECT INFORMATION** | |
|---|---|
| **Property Square Footage** | 30,056.4 |
| **Total Parking Spaces** | 0 |
| **Total Residential Units** | 119 |
| **Affordable Housing Property** | ☐ Yes<br>☒ No |

| **III. MORTGAGE LOAN INFORMATION** | |
|---|---|
| **Amortization Period** | Three hundred sixty (360) months |


**© 2013 Fannie Mae**

| | |
|---|---|
| **Amortization Type** | ☐ Amortizing<br>☐ Full Term Interest Only<br>☒ Partial Interest Only |
| **Effective Date** | April 4, 2017 |
| **First Payment Date** | The first day of June, 2017. |
| **First Principal and Interest Payment Date** | The first day of June, 2018. |
| **Fixed Rate** | 4.31% |
| **Interest Accrual Method** | ☐ 30/360 (computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months).<br><br>or<br><br>☒ Actual/360 (computed on the basis of a three hundred sixty (360) day year and the actual number of calendar days during the applicable month, calculated by multiplying the unpaid principal balance of the Mortgage Loan by the Interest Rate, dividing the product by three hundred sixty (360), and multiplying the quotient obtained by the actual number of days elapsed in the applicable month). |
| **Interest Only Term** | Twelve (12) months |
| **Interest Rate** | The Fixed Rate |
| **Interest Rate Type** | Fixed Rate |
| **Last Interest Only Payment Date** | The first day of May, 2018. |
| **Loan Amount** | **$34,700,000.00** |


**© 2013 Fannie Mae**

| | |
|---|---|
| **Loan Term** | Eighty-four (84) months |
| **Loan Year** | The period beginning on the Effective Date and ending on the last day of April, 2018, and each successive twelve (12) month period thereafter. |
| **Maturity Date** | The first day of May, 2024, or any earlier date on which the unpaid principal balance of the Mortgage Loan becomes due and payable by acceleration or otherwise. |
| **Monthly Debt Service Payment** | (i) $128,785.19 for the First Payment Date;<br>(ii) for each Payment Date thereafter through and including the Last Interest Only Payment Date:<br>(a) $116,322.11 if the prior month was a 28-day month;<br>(b) $120,476.47 if the prior month was a 29-day month;<br>(c) $124,630.83 if the prior month was a 30-day month; and<br>(d) $128,785.19 if the prior month was a 31-day month; and<br>(iii) $171,924.21 for the First Principal and Interest Payment Date and each Payment Date thereafter until the Mortgage Loan is fully paid. |
| **Prepayment Lockout Period** | 0 year(s) from the Effective Date |

| IV. YIELD MAINTENANCE/PREPAYMENT PREMIUM INFORMATION | |
|---|---|
| **Yield Maintenance Period End Date**<br><br>***or***<br><br>**Prepayment Premium Period End Date** | The last day of October, 2023. |


**© 2013 Fannie Mae**

| | |
|---|---|
| **Yield Maintenance Period Term**<br><br>***or***<br><br>**Prepayment Premium Period Term** | Seventy-eight (78) months |

| **V. RESERVE INFORMATION** | |
|---|---|
| **Completion Period** | Within six (6) months after the Effective Date or as otherwise shown on the Required Repair Schedule. |
| **Initial Replacement Reserve Deposit** | $0.00 |
| **Maximum Inspection Fee** | Borrower shall pay Lender for actual costs and expenses incurred by Lender plus a reasonable Inspection Fee not to exceed $300.00 per site visit. |
| **Maximum Repair Disbursement Interval** | One (1) time per calendar month |
| **Maximum Replacement Reserve Disbursement Interval** | One (1) time per calendar month; except in connection with the final disbursement |
| **Minimum Repairs Disbursement Amount** | Not less than $500.00; unless final disbursement |
| **Minimum Replacement Reserve Disbursement Amount** | Not less than $500.00 |
| **Monthly Replacement Reserve Deposit** | $2,870.05 |
| **Repair Threshold** | $10,000.00 |
| **Repairs Escrow Account Administrative Fee** | At the discretion of Lender, a one-time fee in the amount of $500.00, payable one time, may be charged per loan in conjunction with the granting of an extension to Schedule 6 of the Loan Agreement (where applicable). |
| **Repairs Escrow Deposit** | $23,437.50 |


**© 2013 Fannie Mae**

| | |
|---|---|
| **Replacement Reserve Account Administration Fee** | $250.00, payable annually |
| **Replacement Reserve Account Interest Disbursement Frequency** | Not Applicable |
| **Replacement Threshold** | $25,000.00 |

**[INITIALS FOLLOW ON NEXT PAGE]**


**© 2013 Fannie Mae**

BORROWER'S INITIALS: ________


© 2013 Fannie Mae

# MODIFICATIONS TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

## ADDENDA TO SCHEDULE 2 – SUMMARY OF LOAN TERMS
## (New York Gap Note Modifications)
## (Interest Rate Type - Fixed Rate)

**INTENTIONALLY DELETED.**

**[INITIALS FOLLOW ON NEXT PAGE]**


© 2011 Fannie Mae

BORROWER'S INITIALS: ____________


**© 2011 Fannie Mae**

**SCHEDULE 3**
**TO MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Schedule of Interest Rate Type Provisions**
**(Fixed Rate)**

**1. Defined Terms.**

Capitalized terms not otherwise defined in this Schedule have the meanings given to such terms in the Definitions Schedule to the Loan Agreement.

**2. Interest Accrual.**

Except as otherwise provided in the Loan Agreement, interest shall accrue at the Interest Rate until fully paid.

**[INITIALS FOLLOW ON NEXT PAGE]**


**© 2011 Fannie Mae**

BORROWER'S INITIALS: ______________


© 2011 Fannie Mae

**SCHEDULE 4**
**TO MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Prepayment Premium Schedule**
**(Standard Yield Maintenance – Fixed Rate)**

**1. Defined Terms.**

All capitalized terms used but not defined in this Prepayment Premium Schedule shall have the meanings assigned to them in the Loan Agreement.

**2. Prepayment Premium.**

Any Prepayment Premium payable under Section 2.03 (Lockout/Prepayment) of the Loan Agreement shall be computed as follows:

(a) If the prepayment is made at any time after the Effective Date and before the Yield Maintenance Period End Date, the Prepayment Premium shall be the greater of:

(1) one percent (1%) of the amount of principal being prepaid; or

(2) the product obtained by multiplying:

(A) the amount of principal being prepaid,

*by*

(B) the difference obtained by subtracting from the Fixed Rate on the Mortgage Loan, the Yield Rate (as defined below) on the twenty-fifth (25th) Business Day preceding (i) the Intended Prepayment Date, or (ii) the date Lender accelerates the Mortgage Loan or otherwise accepts a prepayment pursuant to Section 2.03(d) (Application of Collateral) of the Loan Agreement,

*by*

(C) the present value factor calculated using the following formula:

$$\frac{1 - (1 + r)^{-n/12}}{r}$$

[r = Yield Rate

n = the number of months remaining between (i) either of the following: (x) in the case of a voluntary prepayment, the


© 2013 Fannie Mae

last day of the month in which the prepayment is made, or (y) in any other case, the date on which Lender accelerates the unpaid principal balance of the Mortgage Loan and (ii) the Yield Maintenance Period End Date.

For purposes of this clause (2), the "**Yield Rate**" means the yield calculated by interpolating the yields for the immediately shorter and longer term U.S. "Treasury constant maturities" (as reported in the Federal Reserve Statistical Release H.15 Selected Interest Rates (the "**Fed Release**") under the heading "U.S. government securities") closest to the remaining term of the Yield Maintenance Period Term, as follows (rounded to three (3) decimal places):

$$\left(\frac{(a-b)}{(x-y)}\times(z-y)\right)+b$$

$a =$ the yield for the longer U.S. Treasury constant maturity

$b =$ the yield for the shorter U.S. Treasury constant maturity

$x =$ the term of the longer U.S. Treasury constant maturity

$y =$ the term of the shorter U.S. Treasury constant maturity

$z =$ "n" (as defined in the present value factor calculation above) divided by twelve (12).

Notwithstanding any provision to the contrary, if "$z$" equals a term reported under the U.S. "Treasury constant maturities" subheading in the Fed Release, the yield for such term shall be used, and interpolation shall not be necessary. If publication of the Fed Release is discontinued by the Federal Reserve Board, Lender shall determine the Yield Rate from another source selected by Lender. Any determination of the Yield Rate by Lender will be binding absent manifest error.]

(b) If the prepayment is made on or after the Yield Maintenance Period End Date but before the last calendar day of the fourth (4th) month prior to the month in which the Maturity


**© 2013 Fannie Mae**

Date occurs, the Prepayment Premium shall be one percent (1%) of the amount of principal being prepaid.

(c) Notwithstanding the provisions of Section 2.03 (Lockout/Prepayment) of the Loan Agreement, no Prepayment Premium shall be payable with respect to any prepayment made on or after the last calendar day of the fourth (4th) month prior to the month in which the Maturity Date occurs.

**[INITIALS FOLLOW ON NEXT PAGE]**


© 2013 Fannie Mae

BORROWER'S INITIALS: ____________


© 2013 Fannie Mae

**SCHEDULE 5 TO**
**MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Required Replacement Schedule**

**[INSERT PROPERTY CONDITION ASSESSMENT REPLACEMENT SCHEDULE]**

**[INITIALS FOLLOW ON NEXT PAGE]**


© 2016 Fannie Mae

## Section 2: Cost Estimate Schedules - Immediate Repairs and Replacement of Capital Items
### Section 2.2 Replacement of Capital Items Schedule

| | |
|---|---|
| Assessment Date(s): | 2/23/2017 |
| Year Built: | 1927 |
| Age(s): | 90 |
| Total Net Rentable SF: | 30400 |
| No. Dwelling Units: | 41 |
| Inflation Rate | 3.00% |
| Estimated Annual Unit Turnover: | 5.00% |

**Replacement of Capital Items**

| Section No. | Item | Capital Expense Category (Choose Category from Dropdown Menu) | AVERAGE EUL (yr) | EFFECTIVE AGE (yr) | RUL (yr) | QUANTITY | UNIT OF MEASURE | Unit Cost | Total Cost over Eval. Period | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | [illegible] | | | | | | | | | | | | | | | | | | | | |
| 3.2 | Structural Frame and Building Envelope (Architectural Components) | | | | | | | | | | | | | | | | | | | | |
| 3.2.5 | Built-up roof | Roofing | 20 | 15 | 5 | 6,000 | SF | 3.90 | $23,400 | | | | | $23,400 | | | | | | | |
| 3.3 | Mechanical / Electrical / Plumbing Systems | | | | | | | | | | | | | | | | | | | | |
| 3.3.3 | Central - gas boiler refurbishment | HVAC and Other Building Systems | 20 | 15 | 5 | 1 | LS | 5000.00 | $5,000 | | | | | $5,000 | | | | | | | |
| 3.4 | Interior Elements (Dwelling Units / Common Areas) | | | | | | | | | | | | | | | | | | | | |
| 3.4.4 | Unit wood flooring - refinish | Carpeting and Vinyl Expense | 15 | 14 | 1 | 20 | Unit | 800.00 | $16,000 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | | | |
| 3.4.4 | Refrigerator | Appliance Capital Expenditures RR | 15 | 14 | 1 | 20 | EA | 391.00 | $7,820 | $869 | $869 | $869 | $869 | $869 | $869 | $869 | $869 | $869 | | | |
| 3.4.4 | Range/Stove | Appliance Capital Expenditures RR | 20 | 19 | 1 | 15 | EA | 330.00 | $4,950 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | | | |
| 3.4.4 | Dishwasher | Appliance Capital Expenditures RR | 15 | 14 | 1 | 20 | EA | 210.00 | $4,200 | $467 | $467 | $467 | $467 | $467 | $467 | $467 | $467 | $467 | | | |
| 3.4.4 | Stacked washer-dryer | Appliance Capital Expenditures RR | 15 | 14 | 1 | 20 | EA | 1100.00 | $22,000 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | | | |
| | Total Uninflated | | | | | | | | $83,370 | $4,108 | $4,108 | $4,108 | $4,108 | $34,508 | $4,108 | $4,108 | $4,108 | $4,108 | $0 | $0 | $0 |
| | Total, Inflated (annual inflation factor @3%) | | | | | | | | | $4,108 | $4,291 | $4,480 | $6,674 | $38,839 | $7,081 | $7,293 | $7,512 | $7,737 | $0 | $0 | $0 |
| | Cumulative Total | | | | | | | | | $4,108 | $12,399 | $18,879 | $25,553 | $64,391 | $71,472 | $78,765 | $86,277 | $94,014 | $94,014 | $94,014 | $94,014 |

| | |
|---|---|
| Annual Cost Per Unit / Year (uninflated) [illegible] | [illegible] |
| Annual Cost Per Unit / Year (inflated) [illegible] | [illegible] |

**Section 2: Cost Estimate Schedules - Immediate Repairs and Replacement of Capital Items**
**Section 2.2 Replacement of Capital Items Schedule**

| | |
|---|---|
| Assessment Date(s): | 2/23/2017 |
| Year Built: | 1927 |
| Age(s): | 90 |
| Total Net Rentable SF: | 30400 |
| No. Dwelling Units: | 42 |
| Inflation Rate | 3.00% |
| Estimated Annual Unit Turnover: | 5.00% |

**Replacement of Capital Items**

| Section No. | Item | Capital Expense Category (Choose Category from Dropdown Menu) | AVERAGE EUL (yr) | EFFECTIVE AGE (yr) | RUL (yr) | QUANTITY | UNIT OF MEASURE | Unit Cost | Total Cost over Eval. Period | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Site | | | | | | | | | | | | | | | | | | | | |
| 3.2 | Structural Frame and Building Envelope (Architectural Components) | | | | | | | | | | | | | | | | | | | | |
| 3.2.6 | Built-up roof | Roofing | 20 | 15 | 5 | 6,000 | SF | 3.90 | $23,400 | | | | | $23,400 | | | | | | | |
| 3.3 | Mechanical / Electrical / Plumbing Systems | | | | | | | | | | | | | | | | | | | | |
| 3.3.3 | Central - gas boiler refurbishment | HVAC and Other Building Systems | 20 | 15 | 5 | 1 | LS | 5000.00 | $5,000 | | | | | $5,000 | | | | | | | |
| 3.4 | Interior Elements (Dwelling Units / Common Area) | | | | | | | | | | | | | | | | | | | | |
| 3.4.4 | Unit wood flooring - refinish | Carpeting and Vinyl Expense | 15 | 14 | 1 | 20 | Unit | 800.00 | $16,000 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | $1,778 | | | |
| 3.4.4 | Refrigerator | Appliance Capital Expenditures RR | 15 | 14 | 1 | 20 | EA | 391.00 | $7,820 | $869 | $869 | $869 | $869 | $869 | $869 | $869 | $869 | $869 | | | |
| 3.4.4 | Range/Stove | Appliance Capital Expenditures RR | 20 | 19 | 1 | 15 | EA | 330.00 | $4,950 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | | | |
| 3.4.4 | Dishwasher | Appliance Capital Expenditures RR | 15 | 14 | 1 | 20 | EA | 210.00 | $4,200 | $467 | $467 | $467 | $467 | $467 | $467 | $467 | $467 | $467 | | | |
| 3.4.4 | Stacked washer dryer | Appliance Capital Expenditures RR | 15 | 14 | 1 | 20 | EA | 1100.00 | $22,000 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | $2,444 | | | |
| | Total Uninflated | | | | | | | | $83,370 | $6,108 | $6,108 | $6,108 | $6,108 | $34,508 | $6,108 | $6,108 | $6,108 | $6,108 | $0 | $0 | $0 |
| | Total, Inflated (annual inflation factor @3%) | | | | | | | | | $6,108 | $6,291 | $6,480 | $6,674 | $38,839 | $7,081 | $7,293 | $7,512 | $7,737 | $0 | $0 | $0 |
| | Cumulative Total | | | | | | | | | $6,108 | $12,399 | $18,879 | $25,553 | $64,391 | $71,472 | $78,765 | $86,277 | $94,014 | $94,014 | $94,014 | $94,014 |

| | |
|---|---|
| Annual Cost Per Unit / Year (uninflated) | $ [illegible] |
| Annual Cost Per Unit / Year (inflated) | $ [illegible] |

**Section 2: Cost Estimate Schedules - Immediate Repairs and Replacement of Capital Items**
**Section 2.2 Replacement of Capital Items Schedule**

| | |
|---|---|
| Assessment Date(s): | 2/23/2017 |
| Year Built: | 1927 |
| Age(s): | 90 |
| Total Net Rentable SF: | 26500 |
| No. Dwelling Units: | 35 |
| Inflation Rate | 3.00% |
| Estimated Annual Unit Turnover: | 5.00% |

**Replacement of Capital Items:**

| Section No. | Item | Capital Expense Category (Choose Category from Dropdown Menu) | AVERAGE EUL (yr) | EFFECTIVE AGE (yr) | RUL (yr) | QUANTITY | UNIT OF MEASURE | Unit Cost | Total Cost over Eval. Period | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 3.1 | Site | | | | | | | | | | | | | | | | | | | | |
| Section 3.2 | Structural Frame and Building Envelope (Architectural Components) | | | | | | | | | | | | | | | | | | | | |
| Section 3.3 | Mechanical / Electrical / Plumbing Systems | | | | | | | | | | | | | | | | | | | | |
| 3.3.3 | Central - gas boiler refurbishment | HVAC and Other Building Systems | 20 | 15 | 5 | 1 | LS | 5000.00 | $5,000 | | | | | $5,000 | | | | | | | |
| Section 3.4 | Interior Elements (Dwelling Units / Common Area) | | | | | | | | | | | | | | | | | | | | |
| 3.4.4 | Unit wood flooring - refinish | Carpeting and Vinyl Expense | 15 | 14 | 1 | 16 | Unit | 800.00 | $12,800 | $1,472 | $1,422 | $1,422 | $1,422 | $1,422 | $1,422 | $1,422 | $1,422 | $1,472 | | | |
| 3.4.4 | Refrigerator | Appliance Capital Expenditures RR | 15 | 14 | 1 | 16 | EA | 391.00 | $6,256 | $695 | $695 | $695 | $695 | $695 | $695 | $695 | $695 | $695 | | | |
| 3.4.4 | Range/Stove | Appliance Capital Expenditures RR | 20 | 19 | 1 | 12 | EA | 330.00 | $3,080 | $440 | $330 | $330 | $330 | $330 | $330 | $330 | $330 | $330 | | | |
| 3.4.4 | Dishwasher | Appliance Capital Expenditures RR | 15 | 14 | 1 | 16 | EA | 210.00 | $2,613 | $373 | $280 | $280 | $280 | $280 | $280 | $280 | $280 | $280 | | | |
| 3.4.4 | Stacked washer-dryer | Appliance Capital Expenditures RR | 15 | 14 | 1 | 16 | EA | 1100.00 | $13,692 | $1,956 | $1,467 | $1,467 | $1,467 | $1,467 | $1,467 | $1,467 | $1,467 | $1,467 | | | |
| | Total Uninflated | | | | | | | | $43,438 | $4,886 | $4,194 | $4,194 | $4,194 | $9,194 | $4,194 | $4,194 | $4,194 | $4,194 | $0 | $0 | $0 |
| | Total, Inflated (annual inflation factor 03%) | | | | | | | | | $4,886 | $4,320 | $4,449 | $4,583 | $10,348 | $4,862 | $5,008 | $5,158 | $5,313 | $0 | $0 | $0 |
| | Cumulative Total | | | | | | | | | $4,886 | $9,206 | $13,655 | $18,238 | $28,586 | $33,448 | $38,456 | $43,614 | $48,927 | $48,927 | $48,927 | $48,927 |

| | |
|---|---|
| Annual Cost Per Unit / Year (Uninflated) | $137.78 |
| Annual Cost Per Unit / Year (Inflated) | $155.33 |

BORROWER'S INITIALS: ____


© 2016 Fannie Mae

**SCHEDULE 6 TO**
**MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Required Repair Schedule**

**23-05 30th Avenue**

| **Repair Description** | **Estimated Cost** | **Maximum Repair Cost x 125%** | **Completion Date** |
|---|---|---|---|
| Remediate and provide satisfactory evidence to the Lender for the one (1) open DOB violation as set forth in Exhibit F-2 of the Lender's loan commitment dated March 30, 2017. | $750.00 | $937.50 | October 4, 2017 |
| Remediate and provide satisfactory evidence to the Lender for the one (1) open ECB violation as set forth in Exhibit F-2 of the Lender's loan commitment dated March 30, 2017. | $750.00 | $937.50 | October 4, 2017 |
| Remediate and provide satisfactory evidence to the Lender for the three (3) open HPD violations set forth in Exhibit F-1 of the Lender's loan commitment dated March 30, 2017. | $2,250.00 | $2,812.50 | October 4, 2017 |
| Minor cracking of the basement slab-on-grade was observed. Although the slab is not accessible to the public, the cracked and heaved area should be repaired to make safe the walking surface. This work can be repaired by the maintenance staff, as part of routine maintenance. | $0.00 | $0.00 | October 4, 2017 |
| Subtotal: | $3,750.00 | $4,687.50 | |


**© 2016 Fannie Mae**

**23-15 30th Avenue**

| **Repair Description** | **Estimated Cost** | **Maximum Repair Cost x 125%** | **Completion Date** |
|---|---|---|---|
| Remediate and provide satisfactory evidence to the Lender for the one (1) open DOB violation set forth in Exhibit F-2 of the Lender's loan commitment dated March 30, 2017. | $750.00 | $937.50 | October 4, 2017 |
| Remediate and provide satisfactory evidence to the Lender for the five (5) open ECB violations set forth in Exhibit F-2 of the Lender's loan commitment dated March 30, 2017. | $3,750.00 | $4,687.50 | October 4, 2017 |
| Remediate and provide satisfactory evidence to the Lender for the twelve (12) open HPD violations as set forth in Exhibit F-1 of the Lender's loan commitment dated March 30, 2017. | $9,000.00 | $11,250.00 | October 4, 2017 |
| Subtotal: | $13,500.00 | $16,875.00 | |

**21-80 38th Street**

| **Repair Description** | **Estimated Cost** | **Maximum Repair Cost x 125%** | **Completion Date** |
|---|---|---|---|
| Remediate and provide satisfactory evidence to the Lender for the two (2) open HPD violations as set forth in Exhibit F-1 of the Lender's loan commitment dated March 30, 2017. | $1,500.00 | $1,875.00 | October 4, 2017 |
| Subtotal: | $1,500.00 | $1,875.00 | |
| Subtotal: | $18,750.00 | $23,437.50 | |
| **Total Amount of Repair Escrow Due at Closing:** | | **$23,437.50** | |


**© 2016 Fannie Mae**

BORROWER'S INITIALS: ________


© 2016 Fannie Mae

**SCHEDULE 7 TO**
**MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Exceptions to Representations and Warranties Schedule**

**NONE.**

**[INITIALS FOLLOW ON NEXT PAGE]**


**© 2016 Fannie Mae**

BORROWER'S INITIALS: ________


© 2016 Fannie Mae

# EXHIBIT A

## MODIFICATIONS TO MULTIFAMILY LOAN AND SECURITY AGREEMENT
## (New York Gap Note Modifications)

The foregoing Loan Agreement is hereby modified as follows:

1. Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement.

2. INTENTIONALLY DELETED.

3. The definitions of "Note" and "Security Instrument" in the Definitions Schedule are hereby deleted and restated in their entirety to read as follows:

> "**Note**" means that certain Amended and Restated Multifamily Note of even date herewith in the original principal amount of the stated Loan Amount made by Borrower in favor of Lender, and all schedules, riders, allonges and addenda attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**


**© 2011 Fannie Mae**

"**Security Instrument**" means that certain extension and modification agreement, multifamily mortgage, deed to secure debt or deed of trust executed and delivered by Borrower as security for the Mortgage Loan and encumbering the Mortgaged Property, including all riders or schedules attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**[INITIALS FOLLOW ON NEXT PAGE]**


**© 2011 Fannie Mae**

BORROWER'S INITIALS: ____


**© 2011 Fannie Mae**